525 So.2d 325 (1988)
Jack O'NEAL
v.
CHRIS STEAK HOUSE, INC., d/b/a Ruth's Chris Steak House, Jackson, Mississippi, and Thomas J. Moran.
No. 87 CA 0374.
Court of Appeal of Louisiana, First Circuit.
April 19, 1988.
*326 Gerald G. Metzer, and Anthony C. D'Antonio, Metairie, and Alfred W. Speer, Baton Rouge, for plaintiff-appellant Jack O'Neal.
J. David Bourland, Baton Rouge, for defendant-appellee Chris Steak House, Inc., et al.
Before SHORTESS, LANIER and CRAIN, JJ.
SHORTESS, Judge.
These proceedings commenced after the demise of a business arrangement between Jack O'Neal (plaintiff) and Thomas J. Moran (defendant). The trial court dismissed plaintiff's suit after trial and assigned oral reasons for judgment. Plaintiff has brought this devolutive appeal.
Defendant owns more than one Ruth's Chris Steak House (Steak House) in Louisiana. Plaintiff is originally from Jackson, Mississippi, and had previously worked for defendant as a salesman in New Orleans and then in San Antonio. Defendant's net worth at the time of trial was approximately two million dollars. Plaintiff's net worth is not evident from the record, but an officer of the lending institution that financed property purchases and construction costs with regard to the opening of the business testified that plaintiff would not have qualified for the loans that were made to the business. These facts as well as testimony from witnesses of both parties that plaintiff was a talented "P.R. man" or "front man" reflect an agreement more consistent with defendant's testimony: that he (Moran) wished to open a Steak House in Jackson, Mississippi and because of plaintiff's connections in Jackson as well as his salesmanship ability, he selected plaintiff to assist in bringing it about. Real estate was purchased and improvements made with funds borrowed on defendant's personal guaranty. Defendant testified that at the outset he agreed with plaintiff to a salary of $1,200.00 monthly until the business started, then one percent of the gross and five percent of the net profits monthly. Defendant further testified that they agreed that upon discharge of the debt incurred in starting the business, twentyfive percent of the business would be given to plaintiff.
Plaintiff testified that his understanding of the agreement was that he had twentyfive percent of the business from its inception. When asked why he did not complain when all of the stock of Chris Steak House, Inc., was issued to defendant, plaintiff replied that he was unaware of the incorporation of the business notwithstanding its appearance as an incorporated entity on operational licenses.[1]
The trial court accepted defendant's version of the arrangement, finding that there existed an agreement between the parties wherein the obligation to transfer twentyfive percent of the business was conditional. The specie of condition (suspensive or resolutory, see LSA-C.C. art. 2021 (1870), now LSA-C.C. art. 1767) was not specified, but it is clear from the court's characterization of the condition[2] that it was suspensive. *327 With this finding plaintiff assigns error.
A review of the record supports the finding of an agreement between the parties. Both defendant and plaintiff testified that there was an agreement as to plaintiffs managing the business for a salary. This manner of contract is the lease of labor, governed generally by the codal articles of Title IV, LSA-C.C. articles 1761 through 2291 (1870) and specifically by Title IX, LSA-C.C. articles 2745 through 2750 (1870). Plaintiff received compensation in the form of a salary for his services.[3] Defendant alone bore the risk of failure of the business. Plaintiffs personal guaranty was neither asked for nor given. This arrangement is inconsistent with the existence of a partnership. Plaintiff was guaranteed a sum of money for his services. He risked nothing and was paid for his time.[4]
A contract for the letting of labor for an indefinite term is terminable at the will of either of the parties. LSA-C.C. articles 2746 and 2747 (1870); Baynard v. Guardian Life Insurance Company of America, 399 So.2d 1200 (La.App. 1st Cir. 1981). A contract for "permanent" employment is considered one of indefinite duration and therefore terminable at will. Griffith v. Sollay Foundation Drilling, Inc., 373 So.2d 979 (La.App.3d Cir.1979). The parties in the instant case contemplated employment of indefinite duration. Plaintiff's employment was therefore terminable at will. We note, additionally, that the record is replete with evidence from which the trial court could have found "good cause," within the meaning of LSC.C. articles 2748 and 2749 (1870), for plaintiff's termination had his employment been specified for a term. Witnesses, including employees and customers of the restaurant, testified as to plaintiff's drinking while on the job and incidents reflecting a lack of responsibility in his daily operation of the business. The trial court noted "problems in the operation of this business" attributable to plaintiff. We are unable to say that this finding is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
This suit was not brought to redress the termination. The agreement between defendant and plaintiff, though, contemplated not only the lease of services for a salary, but the transfer at some future time of a portion of the business. All of the witnesses, except plaintiff himself, testified that the twenty-five percent "would be" plaintiff's.[5] Only plaintiff testified that he was a twenty-five percent interest *328 owner. The distinction is important. The weight of the testimony to the effect that the twenty-five percent interest was not yet plaintiff's but would become his is consistent with defendant's version of the agreement and inconsistent with plaintiff's. Defendant's explanation of the terms of the agreement was:
He would also receive one percent over break even and five percent of the net, in addition to his salary. Not to pay off the debt. That would come out of profit. Because we hadI mean, there was a substantial debt and I was the only signature, and I wanted the debt removed before I gave anybody anything. That's just good business. I don't give anything away nor does any other businessman that I know of, give things before they happen. They don't give rewards for not doing things. And I don't think that that was misunderstood ever.
Plaintiff, on the other hand, when asked whether he was compensated during the months he spent overseeing the renovations prior to the restaurant's opening, was vague and unresponsive:
A. I believe I told you I must have been because I can't imagine me staying up there with absolutely no compensation. But if I was compensated I do not have a record of it.
Q. But you're not saying that you weren't compensated then?
A. No, I'm not saying that I was either. I have no record of it.
The trial court noted this apparent lapse of memory in its reasons for judgment, and we certainly are not in a position based on the record to say that he clearly erred in this regard.
The obligation to transfer the twenty-five percent of the business is distinct from plaintiff's contract for employment but related, inasmuch as the occurrence of the event upon which the transfer was conditioned (the reduction of the debt) depended upon plaintiff's performance under the contract. It is clear from the testimony of both of the parties that they envisioned plaintiff's successful management of the business, profits, and eventual reduction of the debt. Upon plaintiff's termination, the occurrence became impossible. When the occurrence of the suspensive event in the context of a conditional obligation becomes impossible, the obligation ceases to exist.[6]Cheramie v. Stiles, 215 La. 682, 41 So.2d 502 (1949); Bonfanti Marine, Inc. v. Clement, 439 So.2d 537 (La.App. 1st Cir.1983).
We are mindful that an obligor cannot be permitted to benefit from his having prevented the fulfillment of the condition upon which his obligation rests and that in such instance the condition is to be considered fulfilled. LSA-C.C. art. 2040 (1870); Moss v. Guarisco, 459 So.2d 1 (La.App. 1st Cir. 1984), writ denied, 462 So.2d 1247 (La. 1985). We have noted that although the employment contract involved herein was terminable at will, sufficient reasons existed for plaintiff's termination as were found by the trial court. It was not clearly wrong in so finding. Defendant did not prevent the fulfillment of the condition such that it must be considered fulfilled. Plaintiff, if anyone, prevented the occurrence of the event.
For reasons expressed hereinabove, the judgment of the trial court is affirmed at plaintiff's costs.
AFFIRMED.
LANIER, J., concurs in the result.
NOTES
[1] Additionally we note that the written "agreement" dated March, 1979, submitted as plaintiffs exhibit 3, which purports to reflect the business agreement between the parties, though it was never signed by defendant, provides for "Chris Steak House, Inc.," as well as "Thomas J. Moran, Individually," as signatories. Plaintiff testified that he signed the original of this document and forwarded it to defendant.
[2] In oral reasons for judgment issued by the trial court it is characterized as follows:

The condition of the obligation was that the plaintiff would go up there and would run the restaurant in a reasonable manner and an efficient manner and that they would get the business paid for and things would be happy everafter.
[3] The compensation was an amount in dollars, although it appears that defendant contemplated that at some time in the future compensation would be based on a percentage of net and gross profits.
[4] Commentary suggests that the mode of remuneration is determinative of the type of contract, whether its object be things or work. 2 M. Plainol "Traite Elementaire de Droit Civil" § 1827, n. 5 (11 ed. 1939) (La.St.L.Inst.Trans. 1959). Furthermore, Plainol observes that the "essence" of partnership is the community of risks and gains, and that the fixing of a participant's share in a business resulting in insuring that party against loss is a contract of not partnership but letting of work:

The essence of the partnership is the community of risks and gains: as soon as the share of one of the collaborators is fixed, or he is insured against the chances of loss and deprived of the chances of gain, the latter is not a partner, he is a salaried worker; there is in effect not a contract of partnership, but a contract of letting of work.
Id. at § 1827.
[5] Elizabeth O'Neal testified that defendant told her that she and her husband "would get twenty-five percent." When asked what she understood to be exchange for which defendant would give them the interest, she responded:

A. Jack was to go up there to open up the business, renovate the building and he was also to manage it and we were to get a percentage of it.
. . . . . .
Q. Did he reaffirm the terms upon which he had offered it to Jack to you?
A. We were talking about the 25 percent, plus the salary and what have you.
Q. No. In terms of what Jack had to do, did he reemphasize to you what Jack's obligation was to get the 25 percent? He obviously wasn't just going to give it to Jack, was he?
A. The things that he had to do, sure.
Q. Which were?
A. To find a place, renovate it and also to open it up, managing it and then we would get the percentage.
[6] LSA-C.C. art. 2021 (1870) provided, in pertinent part: "If the obligation is not to take effect until the event [happens], it is a suspensive condition." This implies that the obligation exists in some manner of unenforceable state until the occurrence of the event. Plainol suggests:

As long as the condition is still pending, one may say that the obligation which it suspends does not exist; one has only the hope that some day it will come into existence.
(Footnote omitted.) 2 M. Plainol at § 375.